Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to give their attention for the Court is now sitting. God save the United States and this Honorable Court. Okay, good morning, everybody. Welcome to the Fourth Circuit. We have three cases on the docket for hearing this morning. The first case is United States v. Purpera, and we are prepared whenever you're ready, Ms. Westover. Thank you, Your Honor. Morning, Your Honors. May it please the court, counsel. My name is Blair Westover, and I represent Defendant Appellant Frank Purpera. Obviously, I'm interested in whatever questions Your Honors have. But where I was hoping to start out today was the question of whether the court's colloquy with Mr. Purpera after the motions hearing on January 29th constituted a valid waiver of the defendant's right to conflict, excuse me, one more time, conflict-free count it. And the reason I'm starting there is because I'm concerned that the implication of finding the waiver on this case valid is how heavily dependent it was on the advice of counsel who are themselves conflicted without any independent admonishments from the district court. Counsel, counsel. Hi, sorry. This is Judge Harris. Can I just ask you a question about the waiver point? I'm trying to figure out how this fits with the rest of your argument. Is it your understanding that this per se rule you're arguing for, does it mean only that you don't have to show an adverse effect on performance where there is a conflict? Or are you also arguing that if there is this thing called a per se actual conflict, it's not waivable at all? I'm just, does the waiver, yeah. I see, our brief argued that if there was a per se conflict, then we don't have to show the adverse effect. I don't know if we directly said so in our brief. I think if you look at the court cases, if there is a per se conflict, it's also not waivable. If that makes sense, the two tend to go together. But I think in this case, although the cases treat them differently. The cases do treat them differently. I think there's a logical correlation there, if you will. If it's automatically a conflict, it seems like it's something you can't waive. And if you can't waive it, it seems like it's automatically a conflict, if that makes sense. But I agree, the case law treats those differently. Okay, but nevertheless, you want to start with waivers. So you're assuming there's maybe something here that can be waived? I think, yeah. I think that the government agrees at this point, there was an actual conflict. And as a secondary argument, we argue that it's per se. The reason I'm starting with waiver is because if it isn't a per se conflict, we're going to have to get to it. And my concern again here is I don't, I think it's risky to rely so heavily upon the advice of counsel to establish a waiver. So for example, in Brown, this court said that a defendant must be advised not only of the crux of the conflict, like the source of it, but the possible implications. And the only people who could plausibly have discussed those implications with the defendant were counsel who were conflicted. Yes, Shira. But even in the Second Circuit case law that has found a per se conflict, don't the two alleged crimes have to be similar? That is the conflict for the attorney, which is, I guess, alleged witness tampering. Doesn't that have to be substantially similar to obtaining controlled substances fraudulently? And how are they similar? Sure. If you're talking about a per se conflict, I agree that it's not just any investigation out there in the world that a defense attorney might be under that can give rise to a per se conflict. The distinction the government wants to make is that, well, this might have had to do with witness prepping. But wait, I thought you were arguing for a per se conflict. We're arguing both. I'm arguing if it's per se, then we win. If it's not per se, we think we can make out the adverse effect. So that gets back to my question. How can it be per se if those two things aren't substantially similar? I think that if the defense attorney's conduct is related to the investigation of his participation or investigation of the defendant's case, then even though it's not related to the underlying crime that the defendant is charged with, I think that that's an extremely problematic situation. And I'm not sure that distinction matters. Because in both situations, you're going to be dealing with the defense attorney asking questions about or being put in the position of cross-examining someone with whom, in this case, Clara Kraft, with whom the government is alleging he engaged in misconduct. OK. But I agree. I understand the government's argument on that point. I just think that because this is related to the investigation of the case, it's closer to related than it's a completely random investigation somewhere out there in the world. Ms. Westover, does it matter that, in this case, the charging authorities, the prosecutors who were involved in investigating your client's defense counsel were the same prosecutors who were prosecuting the case against your client? And the reason I say that is it would seem to me that a lawyer who had an incentive to in the same case in which the prosecutors were one and the same. Does that make sense? That does make sense. And I think that's absolutely correct. Are there any cases that make that distinction that you're aware of? I'm not aware of the specific. Well, there are cases that emphasize, and I'm not going to be able to come up with those names off the top of my head, maybe while the government's speaking, I can find them, that emphasize the very language that the very prosecutors investigating the defendant are also investigating the attorney that emphasize that language. I'm not going to sit here and claim that I recall I can find any case that hinges directly on that. But I do think that matter. Counsel, sorry, it's Judge Harris. So I'm trying just to pick up on what Judge Diaz was talking about. If that's your theory, that if it's the same prosecutors, you're going to be, maybe you could argue the lawyer would feel compelled to back off so as not to anger the same prosecutors who are investigating him for something else. Then it wouldn't really matter whether or not it was related to the crimes committed by the defendant. And it might also apply even, I mean, you started by saying this isn't going to be any, and it's not enough that the person, the lawyer is being investigated anywhere out in the world. But if it's by these same prosecutors, it might be enough, even if it has nothing to do with the case in question, right? Well, I think, okay, so the question is under the, whether or not it's a per se conflict. So there are like three imaginable situations, right? You've got an attorney that's investigated, totally unrelated. I think we all agree even then there is an actual conflict and there does need to be a waiver, right? But why isn't it a per se conflict if it happens to be the same prosecutor that's prosecuting the case in question? I think there's a very strong argument that it should be a per se if it's the exact same prosecutor, especially if it's the exact same prosecutor and it's on a fact that's related to the preparation for the defendant's trial. I absolutely agree. I think in that situation, it should be a per se. But it wouldn't have to be, I don't understand why it would have to be related to, I have a concern. My concern is that this principle isn't that limited and that if we're going to say anytime the same prosecutor who's investigating a lawyer, it could be for like tax fraud, is also prosecuting a criminal case, then that lawyer has a per se conflict, which might also be unwaivable in your view, which would actually allow a U.S. attorney's office to disqualify any defendant's lawyer wanted to by opening up some unrelated investigation. And that is something I am worried about. So maybe you can address it. I share that concern. I mean, the worry here is that there's a subject for abuse that the United States attorney just make up an investigation essentially to get a defense attorney off the case. And I am concerned about that as well. In terms of- Well, Ms. Westover, you would hope that the attorneys would be bound by their oaths and wouldn't make up a frivolous investigation just to get a lawyer off the case. And I'm not saying any prosecutor would do that. But that is the risk that I would be worried about. And there's a possibility for abuse there at least. And I understand that you want a limiting principle. And I agree if it was just the same office, maybe not per se. I'm sure the government's willing to address that. But this is the same office and its conduct related to the underlying investigation. And I really think he's put in a position where he's going to be cross examining the same people that are prosecuting the defendant on actions that are related to his preparation for that trial. And I do think that that's a hefty conflict. Ms. Westover, let's assume for the moment that we don't agree with you that the conflict is not waivable. And we also find that the waiver in this case was- the advice given by the district court was insufficient. So then we're left to look at the particular circumstances that you've identified as suggesting that the defense lawyer was pulling his punches. So can you talk about that? Because I'm not so sure that I'm persuaded that those show anything on the record that support your case. But obviously, I'm here to be persuaded. So tell me what you think those amount to something here. Thank you, Your Honor. I want to start out as to calling Ms. Perpera, if I can. Becky Perpera. What I think the objective reasonableness isn't so much an issue as the link, right? I think the link is less intuitive. And what I wanted to make sure I got in today is that to determine if there's a link between not calling Ms. Perpera and the conflict, I think what we should look to is what is the they do waive this conflict. And one of those warnings is your lawyer might pull his punches. Respectfully, I think that presenting a technical defense as opposed to a fact-based defense is one way of pulling punches. And by not calling Ms. Perpera, that's exactly what defense counsel in this case did. Because the only way that Dr. Perpera could get acquitted that I can see in those first cases is if they believe he, in the first group of counts, the larger group of counts having to do with the false statements, is if they did not believe that he filled out those forms. And by not putting her on the stand, I think that he made a choice to pursue a technical defense. And indeed, during closing argument, the prosecution attorney, when defense counsel tried to argue that Ms. Perpera filled out the forms and not Dr. Perpera, the prosecutor objected and pointed out that defense counsel didn't call Ms. Perpera to testify to that. So there was no evidence. Ms. Westover, don't we have some indication in the record that had she been called, she would have likely have stood on her Fifth Amendment rights? In fact, that's what happened, right, during the sentencing hearing? Um, it did. But that had to do with, we didn't want to let the prosecution practice her cross-examination in this, in his Dr. Perpera's subsequent trial. Dr. Perpera was subsequently indicted on the 841, for an 841 offenses and fraud offenses. And actually, that appeal, I should say, was just docketed last week before this court. And Ms. Perpera did testify in that trial. I wasn't present for that trial, so I don't know exactly what she said. But I don't think there's any evidence on the record that Becky Perpera would have taken the Fifth Amendment and not testified in Dr. Perpera's case. And in fact, she filed an affidavit saying that she was prepared to testify and planning on testifying until the day of her testimony. Does the affidavit say what she would have said? It says that, I can find it in the record. It says that she would have said that she was the one that filled out the forms, not Dr. Perpera. It's three or four pages. I can look it up here in a second and read it to you. And that he didn't actually read the forms. And that he didn't read the forms, correct. And I think not calling her, the court point, the district court pointed out that Ms. Perpera would have been subject to cross-examination on various topics. I don't think that renders calling her an objectively unreasonable strategy. So can I ask you, when she says she filled out the forms, does that suggest or imply that she signed the forms or that she simply filled them out and then the doctor signed the forms? What she would have testified to, as I recall the affidavit, is that she filled out the she handed it to him. He signed them without reading them. There is some support for that in the record, though it's sort of minimal. It's that she is the one talking to, most of the time, to employees at Henry Schein when trying to figure out how to fill out the forms. So how does that get him off the hook that he didn't read the forms? Well, if he doesn't read the forms, then he doesn't know there's a falsehood in the forms. So even if he signed them, if he doesn't know what he's signing, it has to be an intentionally misleading fact. So it would be a defense to say I trusted my wife. But what about willful blindness? If he would have to trust, he would have to be trusting his wife for the purpose of evading a crime. I guess that hasn't been briefed by anyone. I guess my answer would be we crossed that bridge when we came to it. I haven't thought about it before. I mean, before now, but they would have to put in evidence that that's why he wasn't reading the forms. And I don't know what that would be. At this point, can I ask just a quick question about the standard of review? In assessing this, the district court relied mostly on, you were about to talk about all the problems that might arise on cross-examination. And the district court says, I'm quoting, having sat through the entirety of the evidence in the trial, the district court thinks it would have been detrimental to the defense to call her. What's our standard of review on that? Because I am sort of moved by the fact that the district court sat through the entirety of the evidence and is making this judgment. Sure. My understanding is it's a mixed question of law and fact, so it's de novo. But I would also point out she couldn't know, the district court in this case couldn't know or sit through testimony that didn't happen. And here we're talking about whether or not Ms. Perpera testified. And if that put everything in a new light, I'm not sure that the district court would be in a better position to make that judgment. With that, your honors, I have 10 seconds left. So unless there are any other questions, I'd ask to reserve the remainder of my time for rebuttal. Thank you, Ms. Westover. Ms. Rottenborn, whenever you're ready. Did I pronounce your name correctly? Yes, your honor. Okay, go ahead. Thank you and good morning. May it please the court. My name is Laura Rottenborn on behalf of the government. As the court knows, this case is about a doctor who lied in order to obtain 10,000 pills and has absolutely no record of where a single one of those pills went. When he was held accountable, he's now trying to escape his conviction by bringing on direct appeal, an ineffective assistance of counsel claim that is grounded in an accusation of conflict of interest. But as this court held in Dellinger, the Sixth Amendment does not allow a disappointed client like Perpera to successfully bring such an after the fact attack unless he can prove, and it is his burden to prove, that he did not validly waive the conflict and that his attorney actively represented conflicting interests during the trial and as a result made objectively unreasonable trial decisions. Perpera has not carried his burden on any of those factors and as a result, his Sixth Amendment claim should fail on direct appeal. I'm happy to answer any questions that the panel may have on the conflict of interest. It was the part of the brief that... Yes, your honor. I do have a question just even leading up to the conflict. I can't understand how a text from Ms. Craft to Ms. Castleberry, who was not represented, rises to the level of the government getting phone records from the defense attorney in the first place. Yes, your honor. The government absolutely understand that concern and it was certainly the subject of the motion for prosecutorial misconduct that Perpera's attorney filed. The same attorney who's now alleged to have a conflict of interest. He pursued that allegation of prosecutorial misconduct even when he knew he had been accused of possible misconduct by the DEA task force officer and the court held two hearings on this issue, multi-hour hearings, the second of which was three hours long to address whether there was indeed prosecutorial misconduct or any type of government misconduct in connection with the administrative subpoena that was issued for Mr. Brownlee's cell phone records and the court concluded there were not. Just by way of background on what's in the record is that the witness Castleberry had told the federal agents that she felt threatened and intimidated and then as a result shared the text messages with the agents about alleged interference in Perpera's employees testifying before the grand jury. The task force officer then issued an administrative subpoena. It did not come through the U.S. attorney's office. It was not a grand jury subpoena. How's the defense attorney? Did the defense attorney represent Ms. Craft? Is that? No, your honor. That's exactly the problem is that because Mr. Brownlee was not representing the witness and yet was allegedly encouraging the witness not to testify in the grand jury. Oh, okay. So some some. Okay. So there is some indication that Mr. Brownlee was encouraging Ms. Craft to do this. The text messages refer to John spazzing out that the witness was going into the grand jury room and particularly going into the grand jury room without representation. And the recipient of that text message then told the federal agent that she had felt I believed her words were threatened and intimidated. It's in the record. I think I think we could move on if I because you were about to say I think that the agent hauled off and did this administrative subpoena without any involvement by the U.S. attorney's office. That's correct, your honor. So, okay. Then I understand a little more. I thought perhaps the U.S. attorney's office had done this, which would be much more problematic for me. Yes, your honor. We agree. It was an unfortunate development for the U.S. attorney's office as well just before trial, and as a result, we had to go through a very lengthy hearing on the morning of trial. We understand that this happened through an administrative subpoena, and we understand the agent's concerns in light of the information that he had received from the witness. The government also immediately informed the court that it would not look at the records, that it would not use the records at trial, and had no intention of in any way misappropriating or misusing that information in the prosecution of Dr. Perpera. The district court judge found that there was no misconduct. That finding was not appealed. The only issue that wasn't appealed- I want to go on to, I want to move beyond that. What about the fact that Mrs. Perpera didn't testify? Yes, your honor. That is the primary basis on which Perpera alleges that there was an adverse effect by the attorney's performance as a result of an alleged conflict of interest, and here that allegation simply holds no water. Rebecca Mosig, according to her affidavit, was going to testify that she filled out the forms that Dr. Perpera signed that allowed him to acquire the drugs. Her complicity in his crimes does not exonerate him, and it would not be objectively reasonable to put a wife on the stand who is going to admit to criminal liability without being able to exonerate the client who is being prosecuted. That is not objectively reasonable. All it would do is further confirm that Dr. Perpera had an accomplice to his crimes. It is the doctor who received the drugs. There's no dispute about that. He is the DEA registrant. The only way he can receive the drugs is by submitting the forms to the drug supplier, communicating with that drug supplier, and then receiving the drugs from the drug supplier. He signed the forms. Any allegation that because Rebecca Mosig purportedly helped him out with those forms would only confirm a conspiracy between the two of them, and it would further confirm Dr. Perpera's guilt on the exact offenses charged in the indictment, it would not exonerate him. This is not the case where you had a single perpetrator, and one person would be taking responsibility and exonerating another. If Ms. Mosig, who is now Mrs. Perpera, had taken the stand, the jury would have only further confirmed Dr. Perpera's guilt, and that is the exact determination the district court judge made when deciding whether or not the failure to call Ms. Mosig was an objectively unreasonable decision. Ms. Rottenborn, that's certainly one theory, and not a, I suppose, a somewhat compelling one, but your friend on the other side says that she also would have testified. I'm not sure if she would have testified or someone else would have testified that the the government would have been hard-pressed to show intent. What about that? I will have to check the affidavit to see if that is specifically stated in Ms. Mosig's affidavit. If it's not, then it's not in the record, and it's Perpera's burden to prove, and so without that, it would be a moot point to begin with, but assuming that specific fact is even in the record, it does not change the fact that in Ms. Mosig's affidavit, which obligated both by Henry Schein, the drug supplier, and by the law, to be the one to submit the forms, and that comes attendant a responsibility to know what those forms say, and the crime is knowingly and intentionally making a material misrepresentation in those forms. The government would have been able to argue that by signing the forms, he read the forms, or if he didn't read the forms, he was willfully choosing not to, which amounts to an intentional violation, and that as a result of submitting those forms, Henry Schein provided Dr. Perpera and not Ms. Mosig with drugs that they otherwise would not have provided, because that information was material to their dispensing decision. Can I ask a question about that issue of materiality? So, as I understand these regulations, the Virginia regulations that were at issue, the regulations prohibited prescribing controlled substances to family members, but the regulations did not prohibit prescribing and or administering controlled substances to friends. That appears to have been permitted under the regulations. So, assuming that the standard is objective materiality, if, in fact, the doctor falsely represented that he intended, or he denied on the forms that he intended to prescribe and or administer drugs to friends, and the problem here is that the timeline is, at some point, the doctor was not married to Ms. Mosig. Maybe they were engaged, but they were not married. So, I suppose they were considered friends during a relevant part of this time period, and if that's true, then why would it have been objectively material to the distributor that the doctor falsely represented that he intended to prescribe and or administer drugs to friends, because that was not unlawful. So, you see what I'm getting at here? Yes, Your Honor. It's not clear to me what, so go ahead. Why is that material? I understand the question completely. My opposing counsel will correct me if I'm wrong, but I believe that Dr. Prepera got married in 2014, and the vast majority of these drugs were acquired by Dr. Prepera after the marriage. The April 2014 form, which talks about whether or not Dr. Prepera administers or prescribes drugs to friends, predates the marriage, I think, by a couple of weeks. But my understanding is that the regulations actually change over time as to whether or not friends may be properly given, administered, or prescribed drugs by doctors. And at the time of April 2014, when that first form was submitted to Henry Schein, it was against the law to prescribe to friends under certain circumstances. And so, it would still have been material to Henry Schein under the existing regulations in 2014, whether or not Dr. Prepera was administering or prescribing to both family members and friends. I believe the date of the marriage is in my brief, and I was not trial counsel in this case, so I apologize for not remembering it specifically off the top of my head. But I believe it was just a matter of weeks after that first form, and thereafter they were married. So, just so I understand, you don't think that any of these counts in the indictment are defective based on the relationship and based on the change in the regulations date? Because of the change in regulations, those earlier counts dealing with the forms when the couple were not yet married, that still was a violation of the law, and so would have been material? That's exactly right, Your Honor. And Judge Dillon, the district court judge, addressed this in her memorandum of opinion. I think she uses the word ridiculous, finding it ridiculous to think that Rebecca Mosig would not at least be a friend a couple weeks before their marriage, such that representing to Henry Schein on the purchase form that he was not administering to a friend would strain credulity, because surely they were at least friends just before they got married. Okay. Counsel, sorry, can I ask you another question about the Virginia regulations? There seems to be sort of a dispute between the parties about whether they prohibit only prescribing controlled substances, or also just, I didn't prescribe anything, I just bought them and gave them to people. What's your understanding of what the regulations prohibit, and does it matter for this case? It matters in particular for count 69, which is the record keeping violation, and it only matters tangentially, but there is an exception to when you must keep records, and that exception alleviates a doctor from the obligation of keeping a dispensing log, or a required record regarding the pill, if he is administering, as opposed to prescribing, controlled substances in the lawful course of professional practice, and he's not charging his patients for those drugs. So under that limited exception, you would not have to keep the dispensing log. Dr. Perpera was not practicing in the lawful course of professional practice. His administration... What was your evidence that he was not practicing in the lawful course of medical practice? Yeah. Well, the government submitted as exhibits the regulations that define what is and is not lawful with respect to the administration of controlled substances to a family member, and then the government also put on the testimony of Dr. Burton, who is a physician from Carilion Clinic here in Roanoke, a large hospital. But I thought Dr. Burton only testified about professional norms. I mean, the government argued, in fact, against the... You said Dr. Burton did not give an opinion about the law. That's correct, Your Honor. In one of your other arguments. So how could you rely on Dr. Burton now to basically be giving an opinion about the law? You're absolutely right, Your Honor. The district court properly precluded Dr. Burton from drawing any legal conclusion about whether or not administering to your wife for two and a half years was outside the scope of normal professional practice, but the government did submit the regulations and the law governing this very issue in lieu of having an expert witness draw that legal conclusion. We were all worried about making sure we respected the bounds of an appropriate expert legal opinion. So we submitted the regulations, which the jury then was able to review, and in combination with Dr. Burton's testimony talking about what is standard practice in the industry, it is certainly... The record certainly shows substantial evidence that Dr. Burton was practicing outside the lawful course and was not charging his patients for it, because it has to have both. So Dr. Burton's testimony talks about... Both Dr. Burton and the witnesses from Prepera's offices talk about the fact that Prepera was not giving these controlled substances to his patients as part of their surgeries, and he was not charging his patients for these medications as part of his surgeries. And all of those things would have to be met in order to satisfy the exception for the record-keeping rule. So it's in the totality. But in terms of the actual lawful course of professional practice, the regulations would speak for themselves, and they were admitted as an exhibit. But I'm sorry, and actually it's not clear to me whether it matters to the outcome of this case at all. But the defendant spends a lot of time saying that on their face, the regulation doesn't speak to what the doctor is being charged with here, which is buying the pills and then administering them to someone. It only precludes prescribing controlled substances, writing the prescription and sending the person to a pharmacy, and that didn't happen here. So is that wrong? Is that reading of the regulation incorrect, or does it just not matter? I don't think it matters, Your Honor. There were multiple regulations submitted, some that governed prescriptions and some that governed administration of controlled substances. With respect to the exception to the record-keeping obligation, that applied only to the administration of controlled substances as relevant to this case, and that would require Dr. Perpera to have administered the controlled substances as part of a lawful course of professional practice. And the jury's verdict implies, if not explicitly states, that his practice here was not lawful with respect to the pills that he was requiring to be prescribed. But that has nothing to do with whether or not it would have been appropriate for the distributor to have honored the order at the very beginning of the process. If, in fact, Dr. Perpera could prescribe, could administer drugs to family members, in this case his wife, then why would that have mattered? Well, the witness from Henry Schein explained that it did matter to them. They asked the question of all of their doctors so that they can then cross-reference the answer to that question with the applicable state regulations. And the Henry Schein employee testified that had Dr. Perpera admitted on that form that he was administering those drugs to his wife, they would not have sent them. That alone is sufficient evidence to convict on counts 1 through 68. It was material to Henry Schein, and that alone is sufficient. That seems to suggest a subjective materiality standard, because if the law objectively allows the doctor to administer the drugs but not prescribe them, then isn't the distributor imposing a more burdensome requirement than the law imposes? Theoretically, yes, and that would be absolutely permissible. I mean, a distributor could not provide drugs below the threshold of what the law requires. But if a drug supplier wanted to have more stringent requirements than what the law requires before it distributed drugs to a doctor, it would certainly be in its private right to do so. Here, the key fact is that Henry Schein said that if the doctor said that he was administering the drugs to his wife, they would not have sent the drugs, not only because the law doesn't require it, but because in their view, they wouldn't have done it. And Henry Schein is a private distributor. It's a private retailer. It has every right to decide whether or not it's going to ship drugs to a doctor so long as it's complying with the minimum threshold of the law. Well, again, I'm sorry. I don't want to beat a dead horse, but the standard in this case, the one that the district court instructed on was objective materiality, not subjective materiality. So the fact that the distributor could have, you know, as a matter of whim, just because he was super careful about the distribution of drugs, rejected such an order, that doesn't mean that a reasonable and prudent person understanding what the rules and regulations required would have done the same thing. I'm having trouble making that distinction here. So the material jury instruction that Judge Dillon gave was the traditional instruction of materiality, whether it's a statement that one would reasonably expect to be of concern to a reasonable and prudent person relying upon it. A reasonable drug supplier like Henry Schein, knowing that there are regulations that govern the administration of controlled substances to family members, would find an answer to that question to be of concern. And they would then use that information to cross-reference against the applicable state regulations in deciding whether or not to ship the drugs. And if the drug supplier has concerns about whether or not it's legal, it is absolutely the drug supplier's right to not send the drugs. There's no legal requirement that the drug supplier provide Dr. Parra with those drugs. Presumably, Henry Schein wishes to make a profit and provide drugs wherever they are legally allowed to do so. But there's no affirmative obligation on the manufacturer to provide drugs if they're uncomfortable providing controlled substances to a doctor. And Henry Schein here unequivocally stated that had Dr. Parra been truthful in responding to those questions, the drug supplier would not have shipped the drugs. That is all that is required for proving that Dr. Parra obtained the drugs by material misrepresentation. I see that my time has almost expired. I'm happy to answer any other questions the panel may have. If not, the government urges the panel to affirm both the convictions and the sentence in this case. And we appreciate your time. Thank you, Ms. Frotenborn. Ms. Westover, you have some time for rebuttal. I think you're on mute, Ms. Westover. I'm sorry, Your Honors. I just wanted to quickly address something. I think this is from page 342 of the appendix. The witness from Henry Schein, Mr. Abreu, I believe, testified that the question was important to him, quote, because we would have to adhere to state medical board regulations on treating family and friends. And how do you go about adhering to state medical board regulations on treating family and friends? We would consult the state statute or regulation to determine what the state statute allows or prohibits. And then he says, so if he had checked yes to that question, what would be the next step? We would consult the Virginia regulation on the treatment of family and friends for a controlled substance. And then he said, basically, he said, because people have told me that the Virginia statute prohibits this, we wouldn't have shifted. But it turned out during the trial, the Virginia statute doesn't prohibit it. And that's why we think it matters on the first, the counts 1 through 68. What that statute says. As to what can I perhaps spent more time on this Virginia regulation than I should have. But I mean, it's titled treating and prescribing for self and family. The first section says that treating and prescribing have to be based on a bona fide practitioner patient relationship. And I'm just trying to figure out why would the rule possibly be that a practitioner can't prescribe a controlled substance for a family member, where at least you have to go to a pharmacy and someone else has to fill the prescription and document it and there will be a record. But it's fine if he just wants to buy the stuff himself and give it to his wife. When I look at the regulation as a whole, that just seems like sort of an absurd, not absurd, but perhaps slightly counterintuitive reading. And is there a case law on this? If the whole case turns on this, where is the case law? What's going on here? That's occurred to me too, Your Honor. I would say that in general, it looks to me like there's sort of less that's required for administering. And I'm not a medical professional and I intuitively don't know why that would be true. But in terms of record keeping and things like that, that seems to be consistent. I can certainly provide supplemental briefing on it. I think for the purpose of this trial, it sort of matters what was presented and what was argued. And the district court seemed to concede that, yeah, the statute only prohibits administering. And the expert for the government also sort of conceded the same once it was presented to him. So I think that's sort of what we're left with in this case. The other thing I wanted to quick point out before my time runs out is Becky Perpera in her affidavit. She said, I would have testified that I always provided Frank the forms and he signed them without reading because he trusted that they had been correctly filled out by me. I would have testified that there was never an occasion where I observed Frank to read over the medication order forms personally before executing them with the signature on my assurance to him that they were accurately filled out in part. Those are the two points I wanted to make in rebuttal. So if there are no other questions from the court? My colleagues have any additional questions? No. Okay. Well, thank you very much for your arguments here this morning. The case was ably argued. Traditionally, we would come down from the bench and shake your hands and thank you personally. Obviously, we can't do that, but we're doing so virtually. So accept a virtual handshake from the panel. That's the best we can do under the circumstances. Know that we really appreciate your being here this morning and arguing this case and presenting it to the panel. Thank you very much. Thank you.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris